30 C.C.P.A. (Patents)

## BOSTWICK v. SCHNEDAREK.

## SCHNEDARCK v. BOSTWICK.

Patent Appeals Nos. 4726, 4727.

Court of Customs and Patent Appeals.
June 2, 1943.

Albert R. Teare, of Cleveland, Ohio (Bates, Teare & McBean, of Cleveland, Ohio, and Donald A. Gardiner, of Washington, D. C., of counsel), for Bostwick.

Evans & McCoy, of Cleveland, Ohio (Frank S. Greene, of Cleveland, Ohio, of counsel), for Schnedarek.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

BLAND, Associate Judge.

These are cross-appeals from a decision of the Board of Appeals of the United States Patent Office in an interference proceeding embracing twelve counts. The board's decision affirmed the decision of the Examiner of Interferences in so far as it awarded priority as to counts 1, 3, and 7 to the party Bostwick and counts 10, 11, and 12 to the party Schnedarek but reversed it in so far as it awarded counts 2, 4, 5, 6, 8, and 9 to Bostwick. Each party has appealed from that portion of the board's decision which awarded priority to the other.

The interference is between a reissue application of Bostwick, Serial No. 261,977, filed March 15, 1939, for the reissue of Bostwick's patent No. 2,073,729

granted March 16, 1937, on an application filed July 16, 1936, and the application of Schnedarek, Serial No: 182,269, filed December 29, 1937. The Bostwick application and patent are assigned to the Akron Standard Mold Company, of Akron, Ohio (hereinafter referred to as the Mold Co.), and Schnedarek's application is assigned to the General Tire & Rubber Company, also of Akron, Ohio (hereafter referred to as General Tire). It will be noted that Schnedarek's application was not filed until over nine months after the issuance of Bostwick's patent. Therefore, Schnedarek was under the burden of proving his case beyond a reasonable doubt as to all matter which was disclosed in the Bostwick patent.

As originally declared, the interference was between the Bostwick patent and the Schnedarek application and comprised but six counts, all of which corresponded to claims taken from the Bostwick patent. Bostwick then filed his reissue application, including six claims copied from the Schnedarek application, and moved to amend the issue of the interference by substituting his reissue application for his patent and by adding to the interference six counts corresponding to the claims copied from the Schnedarek application. On March 26, 1940, the interference was redeclared, substituting the Bostwick reissue application for the Bostwick patent and adding the six counts proposed by Bostwick.

The preliminary statement of Schnedarek alleges conception in September, 1935, and reduction to practice in December, 1935. That of Bostwick alleges conception in August, 1934, and reduction to practice in March, 1935.

The applications of both parties relate to collapsible tire-building drums. Such drums are composed of segments which, when extended, form a cylinder. The tire casing is built upon this cylinder by the so-called "flat-band" method. The purpose of constructing the drum in segments is to permit its collapse after the tire is formed, thereby facilitating removal of the tire casing from the drum.

The building of tires on collapsible drums constructed in segments to permit the removal of the tires from the drums was old in the art when both parties entered into the field of the present invention. Bostwick was a prolific inventor of tire-building apparatus, including collapsible tire drums. His assignee, the Mold Co., is, and has been for many years, engaged in the making of tire-building machinery. It developed in the art that when tires having a relatively large cross-section and relatively small bead diameter were made on collapsible drums, such as those which Bostwick had invented and patented, the drums were not sufficiently collapsible to permit satisfactory removal of the tires. Greater collapsibility was required under these circumstances.

The broad inventive concept here involved was to make a pair of collapsible bead-seating rings which would serve to hold the body in expanded condition and which, by reason of their collapsibility, could be readily removed before collapsing the drum so as to afford the removal of the tire from the drum body.

The party Schnedarek, a Roumanian by birth, came to this country at the age of sixteen. At the time he claims he made the involved invention, while in the employ of General Tire, he was twenty-nine years of age. He had previously worked as a draftsman for the Falls Tire & Rubber Company and later for the American Tire & Rubber Company. From 1929 on, he has been associated with General Tire.

Schnedarek's company is a tire building concern. Bostwick's company, as aforesaid, is the builder of tire-manufacturing apparatus. Their respective businesses are located side by side, and the record seems to indicate that their employees saw much of one another, the latter company having furnished for the former company much of its tire-building machinery.

For purposes of treatment the counts may be divided into three groups. As to the first group—the broad counts 1, 3, and 7—the tribunals below have concurred in awarding priority to Bostwick. Of this group we think count 3 illustrative: "3. A tire-building drum comprising a central rotary segment support, a collapsible drum body permanently mounted thereon and composed of pivoted segments, and a pair of collapsible, segmental, bead-seating rings removably locked in the ends of said body and serving to hold the body segments in expanded condition."

As to the second group—counts 10, 11, and 12 (all containing a limitation that two abutting end faces of the bead-seating ring segments shall be inclined to the axis of the drum)—there are likewise concurring de-

cisions by the Patent Office tribunals awarding priority to Schnedarek. Of this group, count 10 appears to be representative: "10. A drum type tire building core comprising a central segmental collapsible band, and independently collapsible side rings engaging the interior of said central band, each of said side rings comprising segments abutting end to end, *two abutting ends of the segments of each ring being disposed at an inclination to the axis of the core, the other abutting ends being disposed substantially in radial planes,* and interlocking elements at the abutting ends of the ring segments for holding the segments against relative lateral movements, the interlocking elements at the abutting inclined segment ends being releasable to permit removal of ring segments. [Italics ours] "

As to the remaining group—counts 2, 4, 5, 6, 8, and 9—there was a difference of opinion below, the Examiner of Interferences awarding priority to Bostwick and the Board of Appeals awarding priority to Schnedarek. Of this group, counts 2, 8, and 9 are alike in that they call for a "full-depth" flange or ring (i. e., that the peripheral face portion of the ring shall be substantially flush with the face of the drum). Count 8 reads: "8. A drum type tire building core comprising a central segmental collapsible band having a substantially cylindrical exterior peripheral face and independently collapsible side rings *each having a peripheral face substantially flush with the peripheral face of the central band,* and inner marginal edge portions underlying the central band. [Italics ours] "

While not necessarily calling for a "full-depth" ring, counts 4 and 5 have a limitation requiring that the ring shall underlap the body. Count 4 reads: "4. A tire-building form comprising a collapsible, segmental form body, and a collapsible, segmental bead-seating ring detachably fitted in the end of said body in an underlapping relation thereto, and inwardly separable from the body, said ring and body having complemental abutting surfaces adopted to permit a slanting inward separating movement of said ring radially and axially of the form."

Count 6 resembles the broad counts 1, 3, and 7 but has a limitation requiring that the ring shall be composed of segments "separably connected in series."

At this point we think it necessary to a clear understanding of the nature of the invention and to a discussion of the issues to set out certain drawings of both parties.

BOSTWICK'S DRAWINGS

SCHNEDAREK'S DRAWINGS

Testimony on behalf of Schnedarek includes his own deposition and those of four other witnesses—Cox, Gilson, Orr, and Kauffman—all employees of General Tire.

On behalf of Bostwick, in addition to his own testimony, witnesses Sigler, Daub, Behra, Deibel, Schrum, Sears, Voth, and Barnby—all employees of the Mold Co.—testified. Numerous exhibits were introduced by both parties, but the controversy appears to center chiefly about Bostwick's Exhibits 100, 108, and 123 and Schnedarek's Exhibits 3, 4, 5, and 6. Bostwick relies upon Exhibits 108 and 123 for conception. Schnedarek relies upon Exhibits 3, 4, and 5 for conception. Both parties rely upon the drum, of which Exhibit 6 is a photograph, for reduction to practice. All the counts admittedly read upon the structure of Exhibit 6. Bostwick apparently also relies upon the drum shown in Exhibit 100 (an earlier drum with detachable rings, wherein the parting line between drum and ring is only about half-way up the shoulder) for a reduction to practice of those counts which do not require a full-depth flange.

The drum shown in Exhibit 6 was made by the Mold Co. for General Tire. It is an eighteen-inch collapsible drum with full-depth collapsible bead-seating rings and appears to conform substantially to the drawings of Schnedarek's application. We shall set out the facts concerning the making of this drum when we come to the determination of the question as to which party is entitled to the benefit of such construction as a reduction to practice.

Bostwick's Exhibit 108 is a mechanical drawing (very much like his patent drawings) bearing the date August 6, 1934. It shows a construction wherein the parting line between the ring and the drum is at the top of the shoulder. Bostwick admits that this drawing is predated, stating that it was made either in the latter part of 1934 or the early part of 1935 but that it was dated August 6, 1934, to conform to the date on which he made the original sketch for the drawing. The original sketch was not introduced in evidence, and no one corroborated Bostwick in this connection.

Bostwick's Exhibit 123 is a crude sketch made by the witness Sigler to show what Bostwick had in mind when he disclosed to Sigler and Behra the broad idea of making the entire shoulder removable in order to permit greater collapse of the drum. This disclosure was made in connection with a drum constructed by Bostwick's assignee for the B. F. Goodrich Company. The date of the sketch is fixed as about June 25 or 26, 1935.

Schnedarek's Exhibit 3 is a mechanical drawing showing the contour of a drum in which the parting line between ring and body is a little more than half-way up the shoulder. The drawing is dated July 12, 1935, and bears the name of "The General Tire & Rubber Company." Appearing thereon is a pencilled modification alleged to have been made by Schnedarek on August 20, 1935, to show how the parting line might be moved up to the top of the shoulder. This modification was embodied in the drawings of Exhibits 4 and 5, bearing Schnedarek's name as draftsman, and dated October 3, 1935, and November 18, 1935, respectively. Schnedarek testified that the drum shown in Exhibit 6 was ordered to be made in accordance with these drawings. Evidence relating to corroboration of this testimony will be discussed hereinafter.

The Examiner of Interferences discussed the evidence in detail and quoted portions thereof. He concluded that Bostwick was the first to conceive the form wherein the parting line was moved further up the shoulder. Apparently he was much impressed with Bostwick's Exhibit 123, and in this connection he said: " * * * Thus, except for the inclined end faces specified in counts 10 to 12, the various features recited in the counts seem to result from the natural and necessary carrying over of the features shown in the earlier removable rings to the modification proposed by Bostwick. In other words, the sketch on exhibit 123 apparently made to show the distinctive feature of the new species of removable ring can not fairly be used to restrict Bostwick's modification to the precise showing of structure therein. The proposal was made to men skilled in the art, who understood well the features of the preceding forms of segmented rings, and in view of this fact it was not necessary for Bostwick, in explaining his conception of the new modification, to laboriously explain every previously used detail with the preciseness that would be found in a mechanical drawing for constructing the device."

As to the drum shown in Exhibit 6, relied upon by both parties for reduction to practice, the Examiner of Interferences had this to say: "Thus, while the Akron Standard Mold Company, Bostwick's assignee, made the drum shown in exhibit 6 and was obviously in possession of the invention embodied therein before it was delivered, it is evident from what has been pointed out above that the witnesses offered

to corroborate Schnedarek do not establish that he had conceived, or that his assignee was in possession of, the structural details embodied in that drum prior to the delivery date."

He called attention to the fact that Schnedarek did not file his application until long after the Bostwick patent issued and stated that this circumstance placed Schnedarek under the burden of proving his case beyond a reasonable doubt. He then said: " * * * Since he [Schnedarek] finally admitted that he is not the inventor of the first removable ring construction, since he appears to be the last to conceive the form wherein the parting was moved further up the shoulder, since the witnesses offered to corroborate him do not establish that he conceived the present invention before contact was made with those associated with Bostwick, and since practically all of the features of the counts apparently would be embodied in the full removable shoulder modification disclosed by Bostwick to many corroborating witnesses before Schnedarek claims to have conceived the invention, it appears evident that, at least as to counts 1 to 9, Schnedarek has not overcome this heavy burden of proof. Priority as to these counts will therefore be awarded to Bostwick."

Priority as to counts 10, 11, and 12 was awarded by the Examiner of Interferences to Schnedarek on the ground that these counts were not readable on Bostwick's disclosure.

The Board of Appeals disagreed with the Examiner of Interferences in his holding that Schnedarek was not sufficiently corroborated as to conception prior to delivery of the drum shown in Exhibit 6. On this subject the board said:

"Schnedarek's Exhibit 6 is alleged to correspond to the working drawings of Schnedarek Exhibit 5. Schnedarek's Exhibit 5 is a working drawing on which all of the counts in issue will read and this bears a notation in the upper right-hand segment:

'For contour see Drg. No. B–1624–2.'
The drawing itself is designated in the title space C–1444 and is dated November 18, 1935.

"Only Schnedarek gave direct testimony with respect to this drawing. It was therefore the examiner's view that Schnedarek is not sufficiently corroborated to support a holding of conception as of the date above

referred to. Bostwick's Exhibit 148, a shop production order for an 18-inch drum for the General Tire and Rubber Co., as originally made out makes reference for drum details to numerous blue prints and patterns of the Akron Standard Mold Co. One of the original entries is entitled, "Undercut—Gen. B/P B–1624–2." This, according to the testimony, refers to the general contour of the drum and corresponds to the notation on Schnedarek Exhibit 5 above referred to. On the bottom of this production order is a note which reads as follows:

'Received Gen. B/P C–1444, 11–19–35. Order castings only. F. D.'

"The Bostwick witness Daub, in answer to XQ. 20, testified that the notation above referred to indicated that he received blue print C–1444 on November 19, 1935. It seems to us that, although Daub offered no direct testimony with respect to the blue print in question, this admission, taken in connection with the fact that the drum actually produced from this shop order corresponded in all essential respects to the blue print, in so far as the side ring structure is concerned, corroborates Schnedarek as to conception, at least as early as the date contained in Daub's notation on production order 37,270 of November 19, 1935. This is entirely consistent with the date appearing on Exhibit 5 of November, 18, 1935, the day preceding the notation made by Daub."

The board also disagreed with the Examiner of Interferences in his holding with regard to Bostwick's conception on the basis of Exhibits 108 and 123. It pointed out that Exhibit 108 was admittedly predated and that there was no corroboration whatever of the drawing itself. Of Exhibit 123, the board said:

" * * * The sketch is wholly lacking in detail, and, unsupplemented, will not satisfy any of the counts in issue. About the most that can be said for the sketch, even when taken in connection with the testimony of the corroborating witnesses, is that it discloses the broad idea of placing the joint between the removable side ring and the body of the drum at a point in line with the periphery of the drum * * *.

"We consider it well settled that a holding of conception can only be based on a completely developed idea of means rather than on an idea of end. Giving to the cor-

roborating witnesses for Bostwick the full benefit of their testimony, little more than an idea of end appears to have been communicated to them by Bostwick. The Examiner of Interferences has taken the position that a disclosure of the change in location of the joint, such as is indicated by Exhibit 123, was a sufficient disclosure to one skilled in the art to warrant a holding of conception. We are unable to agree with this view."

In connection with the drum shown in Exhibit 6, the board stated that nowhere in the Bostwick record is there any working drawing from which the drum is alleged to have been made. It held that the drum was a product of General Tire rather than of the Mold Co. and that in making the drum the latter acted as agent for the former, with the result that the making of the drum inured to the benefit of Schnedarek. On that basis, the board concluded that Schnedarek was entitled to an award of priority as to the "specific counts" (2, 4 to 6 inclusive, and 8 to 12 inclusive). It also found no error in the holding of the Examiner of Interferences that the Bostwick disclosure did not support counts 10, 11, and 12.

The board was of opinion, however, that the broad counts were satisfied by certain earlier constructions of Bostwick's company. It said: "In the specification of the Bostwick patent the concluding paragraph broadly refers to a modification in which detachable bead flanges of less than 'full depth' are inferentially disclosed. We agree with the Examiner of Interferences that the evidence with respect to these generic counts 1, 3 and 7 supports an award to Bostwick. * * *"

Bostwick petitioned for reconsideration and clarification of the board's decision on the ground that as generic counts 1, 3, and 7 had been awarded to him upon the basis of the earlier constructions, counts 4, 5, and 6 should fall in the same category and also be awarded to him. Bostwick's contention was that counts 4, 5, and 6 did not require a full-depth flange. The board clarified its decision by stating that counts 4 and 5 have the limitation of an underlapping relationship which did not aptly apply to the earlier constructions such as shown in Exhibit 100, wherein (quoting from the board), "the removable bead ring is not lapped but completely enclosed by the main ring." It also said that the limitation of count 6 requiring that the segments be separably connect-

ed in series was not satisfied by the Exhibit 100 construction, wherein "the segments are hinged together and merely fold upon each other rather than separate."

■■ We find little difficulty in agreeing with the concurring opinions of the tribunals below as to the first group of counts—the broad counts 1, 3, and 7—and as to the second group—10, 11, and 12—which have the limitation of abutting segmental faces being inclined to the axis of the drum; but we find ourselves confronted with greater difficulty on the more controversial issues involved with reference to the board's decision as to the remaining group of counts—2, 4, 5, 6, 8, and 9.

Schnedarek has argued on his appeal that the earlier "loose ring" drums (such as the drum of Exhibit 100), upon the basis of which the board awarded priority as to counts 1, 3, and 7 to Bostwick, do not support these counts; that the "loose rings" of these drums are not "bead-seating flange structures" as called for by count 1, or "side rings" as called for by count 7, and do not serve "to hold the body segments in expanded condition" as specified in count 3; that such drums are not within the scope of the Bostwick patent or reissue application; and that one of such drums (that corresponding to Bostwick's Exhibit 126) was unsuccessful in operation and therefore is not a reduction to practice. We are not impressed with these arguments. As to the contention that the "loose rings" are not "bead-seating flange structures" we agree with the statement of the Examiner of Interferences that—"Since the bead extends within the parting line of these flanges * * * it would appear that they constitute bead-seating flange structures."

As to the argument that such drums are not within the scope of the Bostwick patent or reissue application, we likewise agree with the Examiner of Interferences that— "The Bostwick patent, while disclosing the preferred form in which the entire shoulder is removed, specifically states at the end of the specification that the invention is not to be limited to 'full-depth rings.' " And, finally, we believe that the evidence amply shows that the earlier Bostwick drums were successful in operation.

With reference to counts 10, 11, and 12, Bostwick has argued on his appeal that the modification shown in Fig. 4, supra, of his patent drawings contemplates a construction wherein the abutting end faces of two

of the ring segments must necessarily be inclined to the axis of the drum because the pivot 45a is inclined to the axis. That argument, however, is not convincing. The inclined face is clearly shown at 19 of Schnedarek's Fig. 3 by a dotted line. There is no such disclosure in Bostwick's drawings. Any holding that Bostwick's disclosure supports the limitations of these counts would have to depend on inferences and presumptions. So far as we can determine from the drawings and specification, the end faces (which are not shown) of the segments in the modified construction of Bostwick's Fig. 4 might just as easily be not inclined as inclined. The express limitation in the counts cannot find support in such a vague disclosure. Additionally, there is the fact to consider that both tribunals below have held against Bostwick on this issue. In view of the discussion of the Examiner of Interferences, which went into detail on the various features bearing upon this question, we deem it unnecessary to repeat the same here. It seems clear to us that the tribunals below correctly held that the limitation in question was not disclosed in the Bostwick patent.

The Examiner of Interferences awarded the third group of counts to Bostwick because in his opinion Bostwick was the first to conceive and further because the drum illustrated in Exhibit 6 was in Bostwick's possession prior to any date upon which Schnedarek was corroborated as to conception. As before stated, both parties relied upon that drum for reduction to practice. In effect, the Examiner of Interferences held that the construction of that drum inured to Bostwick's benefit. The Board of Appeals, however, disagreed with the examiner on this question and, after considering many phases of the voluminous testimony and numerous exhibits, all of which present a complex and rather unusual picture, held that, notwithstanding certain inconsistencies in dates and testimony, Schnedarek was entitled to the benefit of the Mold Co.'s construction of the article represented by Exhibit 6.

We are inclined to agree with the board rather than with the Examiner of Interferences on the question as to whether Bostwick conceived prior to Schnedarek the construction of a drum such as shown in Exhibit 6. Exhibit 108, being admittedly pre-dated, is not sufficient to establish prior conception. Exhibit 123, as previously indicated, is but the crudest kind of sketch and, as it stands, could hardly be said to support the limitations of any of the counts. Such was the holding of the board.

A careful consideration of the third group of counts requires, as we have indicated, that they in turn be divided into three groups, the first being 2, 8, and 9, the second being 6, and the third being 4 and 5.

The first question involving our consideration obviously is: Who is entitled to the credit for the reduction to practice based upon the tire drum represented by Exhibit 6?

We have hereinbefore set out the views of the Examiner of Interferences and of the Board of Appeals on this question. After considering the reasons assigned by each tribunal for arriving at their opposite conclusions and also having examined all the exhibits and considered all the arguments relating to this unusually close question, we are unable to say that the board's decision on this question is erroneous.

In this connection, we think it significant that nowhere in the Bostwick record are there to be found working drawings corresponding to the structure of Exhibit 6. From the evidence it appears that the construction of the drum came about in this manner:

Schnedarek's Exhibits 4 and 5 are alleged to be the working drawings for the drum. The blue print number of Exhibit 4 is C–1438, dated October 3, 1935. The blue print number of Exhibit 5 is C–1444, dated November 18, 1935.

The first step leading toward construction appears to be the requisition therefor, Exhibit 11, which is dated October 24, 1935. It was written by Kauffman of General Tire and calls for an 18-inch tire-building drum of the contour of B–1624–2 (the blue print number of General Tire's contour drawing, Exhibit 1). A notation on the requisition, "make these drums with removable side rings to C–1438," was said to have been written by Remark, another employee of General Tire, who was not called to testify.

The Mold Co.'s "Pattern Shop—Production Order," Exhibit 148, is dated November 13, 1935. On it is a note written by Bostwick's witness, Daub, reading, "Received Gen. Bp C–1444, 11–19–35, order castings only. F. D." Daub admitted that he wrote the note.

The formal purchase order of General Tire for the drum is Exhibit 10, dated December 31, 1935. It conforms to the requisition and refers to the number thereof.

Next in point of time is the Mold Co.'s invoice, Exhibit 13, dated January 7, 1936. It refers to the number of the pattern shop production order and also to that of the purchase order. It calls for "1–18" Auto Drum—No Brake—Serial No. A–1811" and states that delivery was made December 17, 1935. A–1811 is the serial number of the drum shown in Exhibit 6.

Finally, General Tire's receiving record, Exhibit 12, is dated January 10, 1936. It refers to the number of the purchase order.

Continuity among these various orders, invoices, etc., is established by the numerical cross references appearing thereon.

It is noted that the dates of the formal purchase order, Exhibit 10, and of the receiving record, Exhibit 12, are subsequent to the date of delivery of the drum as shown in the invoice, Exhibit 13. Schnedarek's witness Cox, a cost accountant for General Tire in charge of purchasing records, explained this discrepancy as due to the fact that occasionally orders for equipment were given orally before the formal purchasing order was made and that receipt slips were made by the receiving clerk before payment and after the date of invoice rather than at the time of actual delivery. That the drum was actually received by General Tire at about the time shown in the invoice (i. e., December 17, 1935) is corroborated by Gilson (testifying for Schnedarek) who said that he inspected the drum. He produced the inspection record (Exhibit 20) showing that the drum was inspected on December 19, 1935.

The board concluded from this evidence that Schnedarek had conceived the invention and furnished the drawings from which was constructed the tire-building drum delivered by the Mold Co. to General Tire on December 17, 1935; that the drum was built by the Mold Co. as agent for General Tire; and that in the absence of any conclusive evidence on the part of Bostwick showing any other activities entitling him to credit for Exhibit 6 as a reduction to practice, priority should be awarded to Schnedarek as to counts 2, 4, 5, 6, 8, and 9, now under consideration.

We think the record supports the conclusion of the board that Schnedarek has met the burden placed upon him of proving that he was entitled to the credit for the drum represented by Exhibit 6 as a reduction to practice. In our view, however, this does not entirely settle the controversy as to some of the counts.

The particular feature of counts 2, 8, and 9 in controversy here is the requirement that the cylindrical external face portion of the bead ring shall be substantially flush with the external face of the drum body. Bostwick in effect concedes that these counts do not read upon his earlier constructions, such as the drum of Exhibit 100, and that unless he is entitled to credit for the drum of Exhibit 6, he may not have these counts. We therefore conclude that the board correctly ruled that priority as to counts 2, 8, and 9 should be awarded to Schnedarek.

The next count to consider is count 6. The controversial feature of this count is the requirement that the ring segments be "separably connected in series." In this connection the board held, on petition for reconsideration, that the count was not supported by the drum of Exhibit 100 because the segments of the ring for that drum were "hinged together and merely fold upon each other rather than separate." Bostwick contends, however, that the limitation of count 6 was within the scope of his concept and that support therefor is to be found in his Exhibits 120 and 121 (drawings for drums constructed for the Goodrich company prior to the drum of Exhibit 6) and in his Exhibit 144 (a ring drawing for a 24-inch drum constructed for General Tire prior to the drum of Exhibit 6). In each of these drawings one hinge, marked "Hinge A," is shown to be of open construction, so that the key segment may be separately removed. Two of the segments, however, are fixedly hinged together and may only be folded, one upon the other. We do not believe that these exhibits are sufficient to show either a concept or a reduction to practice of a segmental bead-seating ring "separately connected in series." We have considered this question very carefully but find no merit in Bostwick's contention and accordingly approve of the board's view as to this count.

We next review the board's decision as to counts 4 and 5. The particular feature of these counts with which we are concerned is the requirement that the ring shall be "detachably fitted in the end of said body in an underlapping relation there-

to." The board held, on petition for reconsideration, that this "language, particularly the word 'underlapping,' does not aptly apply to a construction such as shown in Exhibit 100." With this view we are not able to agree. On the contrary, we are disposed to agree with the contention of Bostwick that the earlier constructions such as the drum of Exhibit 100 (inventorship of which Schnedarek has disclaimed) support the underlapping limitation.

Counts 4 and 5 originated in the Bostwick patent, and Bostwick is clearly entitled to an award of priority as to these counts if his earlier work, as is evidenced by Exhibit 100, produced a device upon which the limitations of these counts, including the limitation of a "bead-seating ring detachably fitted in the end of said body in an underlapping relation thereto," read. It is conceded that Schnedarek's Exhibit 2, in respects with which we are here concerned, illustrates a cross-section of drums like that shown in Exhibit 100. A portion of the outside of the ring, as shown in said Exhibit 2, is not enclosed by the drum body. The drum body, however, overlaps that portion of the ring which is of greatest diameter, and it is by this over-lapping-underlapping relationship that the ring is held in place until it is released before collapsing the drum, thereby permitting the ring to be separated from the drum body. If the underlapping relationship applies to Exhibit 6, which is a photograph of the structure of Schnedarek corresponding to his patent drawings which enable Schnedarek to make the said counts, we think it also applies to and reads upon Exhibit 2 or the structure of Exhibit 100, although in Exhibits 2 and 100 the location of the underlap occurs below the top of the shoulder whereas in Exhibit 6 it is disposed at the top of the shoulder.

Some of the exhibits cited by the board as a basis for awarding the generic counts, 1, 3, and 7, to Bostwick, namely, Exhibits 115, 119, 120, 121, 126 and 127 appear amply to satisfy said limitation. These exhibits are drawings for drums constructed by the Mold Co. for the Goodrich Company prior to the drum of Exhibit 6. The further limitation of counts 4 and 5 that the abutting faces of the ring and body be "beveled" or "adapted to permit a slanting inward separating movement of said ring radially and axially of the form" also finds support in Exhibits 126 and 127.

Priority as to counts 4 and 5 must therefore be awarded to Bostwick.

Innumerable issues have been raised and countless arguments advanced by the parties in this unusually complex case and we have carefully considered them all. Those which we have not discussed were contingent upon the determination of the issues we have decided, and we therefore deem it unnecessary to prolong this opinion by any further discussion.

The decision of the board must be modified. It is affirmed in so far as it awards priority of invention as to counts 2, 6, and 8 to 12, inclusive, to Schnedarek and priority as to counts 1, 3, and 7 to Bostwick but reversed in so far as it awards priority as to counts 4 and 5 to Schnedarek. Schnedarek is therefore entitled to priority as to counts 2, 6, 8, 9, 10, 11, and 12; and Bostwick, to counts 1, 3, 4, 5, and 7.